Filed 2/23/16  P. v. Truong CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KENG QUAN TRUONG,<br><br>    Defendant and Appellant. | H040147<br>(Santa Clara County<br>Super. Ct. No. C1106741 ) |

Defendant Keng Quan Truong was convicted by jury trial of eight counts of forcible sodomy (Pen. Code, § 286, subd. (c)(2)(A)),[1] two counts of forcible oral copulation (§ 288a, subd. (c)(2)), and one count of dissuading a witness by force or threat of force (§ 136.1, subd. (c)(2)).  The court imposed a prison sentence of 84 years.  On appeal, he contends that (1) the trial court prejudicially erred in admitting testimony about child sexual abuse accommodation syndrome (CSAAS) and in instructing the jury with CALCRIM No. 1193 regarding the CSAAS evidence, (2) the trial court prejudicially erred in giving the jury a flawed version of CALCRIM No. 3501, a unanimity instruction, (3) his sentence is cruel and unusual punishment, (4) his trial counsel was prejudicially

---

[1]    Subsequent statutory references are to the Penal Code unless otherwise specified.

deficient in several respects, and (5) he suffered cumulative prejudice from multiple errors. We affirm the judgment.

## I. The Prosecution's Case

When Michael Doe was 12 years old, he began going to the Vietnamese American Center (VAC) after school, where he received tutoring and karate lessons. Michael and a group of other children his age were assigned to be tutored by defendant. Defendant was eight years older than Michael. During the summer after seventh grade, Michael continued going to VAC, but only for karate and to tutor other children. Defendant was not present during the summer. When Michael was in eighth grade, defendant was again Michael's tutor. In the middle of that year, defendant took some of the children, including Michael, bowling. During Michael's eighth grade year, defendant started coming over to Michael's house on Sundays to "just hang out." Defendant would play games or watch television with Michael and Michael's little sister. At this point, Michael was 14 years old.

When Michael started high school in ninth grade, defendant told Michael that Michael needed to come to VAC to "do community service" because it was required "in order to graduate [from] high school . . . ."[2] Defendant began picking Michael up at Michael's home every weekday and driving him to VAC, where Michael would tutor other children. Defendant would also drive Michael home each weekday evening. After Michael finished ninth grade in 2007, defendant began taking Michael on more outings. They went to the beach, camping, and to the movies.[3] The summer after ninth grade, Michael's family moved out of the school district where he had been attending high

---

[2]     Michael later learned that this was not true.

[3]     Michael also testified that he went to the movies with his friend Tai and defendant in the spring of his eighth grade year.

2

school. Michael wanted to stay at the same high school. Defendant suggested that Michael use Michael's aunt's mother's address, which was within that school's district, so that he could stay at the same high school. Defendant offered to drive Michael back and forth to school each day. Using the aunt's mother's address, Michael was able to attend the same high school, and defendant began driving him to and from school. Michael's parents gave defendant $100 a month to cover his gas.

In the fall of 2007, when Michael began his sophomore year, he was 15 years old. One day, defendant showed Michael some marks on defendant's wrists and told Michael that he had burned these marks into his wrists with a piece of jade. He said that the marks indicated the "Moon Organization" that he worked for. Defendant told Michael: "'[M]y organization, we handle bad kids. We punish them.'" Defendant told Michael that Michael was "being bad," and defendant's "'crew wants to take pictures of your private parts.'" At first Michael thought defendant was joking, and he was confused. Defendant then threatened to "go to the police and tell them that [Michael was] using a fake address to go to school" if Michael did not allow the pictures to be taken. Michael was afraid that he and his aunt's mom would "get in trouble" if defendant told the police, so he allowed defendant to take pictures of his penis.[4]

The day after the pictures were taken, defendant took Michael to defendant's home for the first time and told Michael that the "Moon Organization" wanted to "punish you some more." Defendant claimed that Michael had three choices: "'You either have sex with me, sex with someone that was in the same tutoring group, or I'm going to report to the police'" about the use of the aunt's mom's address. Because he did not want anyone else to get in trouble, Michael chose to have sex with defendant. Defendant sodomized Michael in defendant's bedroom, and he made a video-recording of the event, which he said he was going to send to the Moon Organization. Michael told no one about

---

[4]     Michael did not initially tell the police about these pictures.

3

this event because he was "ashamed." The next day, defendant told Michael that he had "'performed badly'" because Michael had screamed as defendant sodomized him. Defendant told Michael that they "had to do it again today." Defendant sodomized Michael again that day, and he again recorded the event. Michael found the sodomy painful, and it caused him to experience constant diarrhea.

After that, defendant told Michael that the Moon Organization required Michael to have sex with defendant every Wednesday. Michael complied because he was "scared" even though he felt it was wrong, and he did not like defendant. Defendant threatened that the Moon Organization might post the video of them having sex and the picture of Michael's penis on the Internet. Defendant also told Michael that Michael's father, who was a machinist, was "gonna have his finger chopped off" or both his parents might lose their jobs if Michael did not comply.[5] Defendant hit Michael on the hand or "butt" with a stick or a ruler if Michael didn't "listen to him" or did "something that he didn't like." Defendant was jealous of Michael's friends and told Michael what Michael could and could not do. On one occasion, Michael wore hair gel in his hair, which defendant did not like. Defendant punished Michael by branding him on his back with a hot piece of jade.

When Michael turned 16, defendant began requiring Michael to have sex with him two or three times a week, rather than just once a week. Until Michael was 17, defendant always put his penis in Michael's anus. When Michael was 17, defendant began sometimes requiring Michael to put his penis in defendant's anus. He also began requiring Michael to have oral sex with him. Defendant took many photos of Michael naked and often videotaped their sexual encounters. Overall, he forced Michael to have

---

[5]     When Michael's father lost his job during Michael's freshman year in college, defendant claimed that the Moon Organization was responsible.

4

oral and anal sex with him more than 100 times. The frequency remained two or three times a week until Michael graduated from high school.

Michael turned 18 in February 2010 and graduated from high school in June 2010. When Michael began attending college, defendant demanded that Michael have anal and oral sex with defendant at least five times a week. Defendant told Michael that he did not want to have sex with him but did so only because the Moon Organization required it. Michael no longer believed that the Moon Organization existed, but he continued to have sex with defendant because defendant threatened to expose the explicit pictures and videos of Michael. Michael testified that he was "forced to" have sex with defendant.

In August 2010, defendant presented Michael with a typed contract laying out the "rules" for how Michael was to behave. The contract purported to be between Michael and the Moon Organization, and it described punishments for violations. Defendant told Michael that "something bad's gonna happen" if he did not comply with the contract's rules. The contract required Michael to obtain permission from the Moon Organization to have sex with any female. It also governed his use of his computer.

By April 2011, when Michael was 19 years old, Michael had grown "tired of everything" and "wanted control of my life." He went to the YWCA and met with a counselor. The counselor contacted the police, who then interviewed Michael. At the suggestion of the police, Michael made a pretext call to defendant. The police searched defendant's bedroom and found the contract in a book where Michael had told the police defendant kept it. The police also seized defendant's video camera and his laptop computer. The computer contained naked photographs of Michael sitting on defendant's bed and a video of them having sex.

After Michael reported the offenses, defendant talked to Michael twice and "tried to make me feel guilty" for pressing charges. Defendant told Michael: "'If I go to jail, I'm gonna make your parents go with me.'" He also said: "'If you press charges, I'm gonna have someone give your parents AIDS and your family AIDS by a needle.

5

Michael called the police, sounding "[t]errified," and said he wanted to "drop all the charges." After a restraining order was obtained for Michael against defendant, the case proceeded.

When the police interviewed defendant after Michael's report and asked him about Michael, he told them about how he had driven Michael to school when Michael was in high school. He also said he had seen Michael the previous day, and they had had "a little argument." Defendant adamantly denied that he had had a sexual relationship with Michael. He also told the police that there was "no proof" of any sexual relationship between them. "[O]ur relationship is only brother." Defendant also denied that he had taken any pictures of Michael or a video of them having sex. However, he admitted that he sometimes "hit" Michael to discipline him and that "[s]ometimes I'm very mean to uh, to him." When a police officer showed defendant the video of Michael and defendant having sex that the police had found on defendant's computer, defendant claimed that the video was "fake."

## II. The Defense Case

Defendant's eldest sister testified that when she met Michael she and defendant were sharing a bedroom in their parents' house. Michael came to their home once or twice a week after school and went into the room she shared with defendant or into the living room to study. She was usually in the bedroom when Michael was there, and the door to the room was open. Her mother was usually home as she did not work outside the home. Defendant's sister never saw or suspected anything "inappropriate" was occurring. The family later moved to another home where she and defendant each had their own bedroom. She could not remember when they moved. Her parents were retired, so they were usually home. Michael continued to come to the home and go into defendant's bedroom. The bedroom door was always open. She did not know if defendant and Michael had sex in defendant's bedroom, but she never heard any "strange

6

noises." However, she was sure that they had never had sex "[b]ecause I trust my brother," and he had told her that "he didn't have sex with Michael." She believed that Michael "is trying to trick my brother." She had made statements to an investigator that were inconsistent with her trial testimony.

Defendant's father testified that he did not know Michael well because he was generally at work until 2009, when he retired. Defendant's father did not encounter Michael until after he retired. In 2010, Michael would come to the house every few weeks and go into defendant's room, but the door to the bedroom would remain "ajar." In 2011, Michael came over every day.

Defendant's mother testified that defendant and his sister shared a bedroom until 2009. She testified that Michael began coming to their home in early 2008. He came by "once every few weeks or every month." Michael and defendant would study in the living room. She testified that they never went into defendant's bedroom because "I don't allow boys to go into my daughter's room." The family moved to a different house in October 2009. In 2010, Michael continued to come over once every few weeks. He and defendant would study in defendant's bedroom with the door open. In 2011, Michael came over every day. He would take defendant to school in the morning, and they would return and go into defendant's bedroom after school.

Defendant testified at trial that he was gay but hid that fact from his parents because they disapproved of homosexuality. He first met Michael when Michael started coming to VAC for tutoring. Michael was 11 or 12 years old at that time and in the seventh grade. Defendant was Michael's tutor when Michael was in seventh and eighth grades. In 2006, defendant began going to Michael's home to tutor both Michael and Michael's sister. He did not go there often because he was busy with other things. In 2007, when Michael was in ninth grade, defendant brought Michael with him to a group event that included dinner and a movie. Defendant was continuing to tutor Michael. He agreed to drive Michael to and from high school in the 10th grade because Michael asked

7

him to do that so he could stay at the same high school. Defendant testified that he always drove Michael directly to Michael's home after school and then left.

Defendant denied that he had ever taken a picture of Michael's penis. In January 2008, their relationship changed "into a brother and brother relationship." Defendant and Michael went to a Buddhist temple and vowed to be brothers to each other. Michael was just one of more than a dozen "god-brother[s] and sister[s]" that defendant had. In early 2008, Michael "all the sudden" wanted to come to defendant's house to study. They would study in the living room. The two also started going on more outings together. They continued to study together at defendant's house when Michael was in 11th grade. There was nothing sexual between them when Michael was in the 10th and 11th grades.

In September 2009, when Michael was in 12th grade, defendant found a bisexual pornographic magazine in Michael's backpack. By this time, defendant's family had moved to the house where defendant had his own bedroom. Defendant and Michael would study in defendant's bedroom. In November 2009, Michael told defendant that he loved defendant "as my lover, not brother." Defendant was "shocked" and told Michael not to speak of this again. However, Michael kept bringing it up every few weeks. A week after Michael's 18th birthday in February 2010, Michael brought up this topic again, and defendant falsely told Michael that he liked another guy in hopes of avoiding this topic. In April 2010, Michael asked to drive defendant's car, and defendant allowed him to do so. Michael drove dangerously, and defendant got mad at him. The next day, Michael came to defendant's house to study. Michael again told defendant that he wanted to be lovers rather than brothers. Michael threatened that "if I don't want to be with him as a boyfriend" he would "hurt himself or abandon his education." Michael said that his dangerous driving had been an attempt to kill the two of them. Defendant was "[s]cared" and "confused," and he told Michael that he would consider the issue and give him an answer when Michael graduated from high school.

8

On June 10, 2010, the day Michael graduated from high school, defendant told Michael that he wanted to be Michael's boyfriend and lover. Michael immediately kissed defendant on the lips. A few days later, Michael spent the night in defendant's bedroom. Defendant testified that Michael was the dominant person in their relationship. Michael initiated sexual activity and touched defendant's penis. Defendant was reluctant, but Michael persuaded him to have anal sex with him. Michael put his penis in defendant's anus. A month later, defendant told Michael about his prior sexual history and about the fact that he had promised his parents that he would marry no later than 2014. Michael responded by slapping defendant across the face. After this incident, Michael became "more controlling and aggressive and abusive." He "control[led] every aspect of my life."

Defendant wanted out of the relationship, but Michael presented him with a handwritten contract in August 2010. Michael promised not to mistreat defendant anymore. Michael cried and tried to hurt himself with a knife. Instead, the knife cut defendant and left a scar. Due to his concern that Michael would harm himself, defendant agreed to type up the contract that Michael had written. Defendant was willing to "do whatever to please him" because "I love him." He did not even know what some of the provisions in the contract meant. Michael threatened defendant with the knife and forced him to sign the contract.

In September 2010, defendant and Michael had oral sex for the first time. They were in defendant's bedroom, and Michael insisted that defendant orally copulate him. It was Michael's idea to make a video of them having sex, and defendant agreed to it because he was "curious." They made five to seven videos with defendant's camera of them having sex, and they also took pictures of the two of them kissing. Defendant claimed that Michael always recorded the videos and pictures on Michael's flash drive and kept the drive with him. By March 2011, defendant wanted to end the relationship because Michael had become so controlling and abusive. Michael would not let

9

defendant see other friends, and sometimes Michael would hit defendant and call him names. Defendant was planning to break up with Michael. The video that the police found in defendant's bedroom was of the two of them having sex in March 2011. On April 15, 2011, they had sex for the last time. On April 19, they argued, and defendant gave Michael a letter regarding the end of their relationship.

Defendant testified that he had purposely made a scar on his chest with a piece of jade. It was Michael who claimed that defendant belonged to "a Moon Organization" because he thought defendant's scar looked like a moon. Defendant denied having burned Michael's back with a piece of jade. He also denied having threatened Michael. Defendant admitted that he had slapped Michael twice. He claimed that slapping was what he had meant when he told the police that he had hit Michael. Defendant testified that he lied to the police about his relationship with Michael because the police officers had lied to him so he did not trust them. He also claimed that he lied to the police "to protect Michael."

Defendant claimed that Michael had been setting him up since August 2010. He believed that Michael had set him up out of jealousy because he had told Michael about his prior relationships and about his promise to his parents that he would marry when he was 30 years old. Defendant testified that Michael had made up the allegations to "take revenge" on defendant because Michael knew that "[t]he thing that I hate the most, which is involve underage sex." "He create a story that I'm forcing him to have sex with him . . . ." Defendant denied that he had ever forced Michael to have sex with him. He insisted that they had sex only when Michael was an adult, and it was always consensual.

### III. Discussion

### A. CSAAS Evidence

Defendant claims that the trial court should have excluded CSAAS testimony under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) and because it was irrelevant and

unduly prejudicial. He also contends that the CSAAS testimony exceeded its proper purpose and that the trial court's instruction of the jury with CALCRIM No. 1193 was inadequate.

## 1. Background

The defense moved in limine to exclude testimony by Carl Lewis about CSAAS. It asserted that this testimony would be "irrelevant and an inappropriate area of expert testimony." The defense argued that "CSAAS is no longer recognized as a theory that applies in forensic settings and does not meet the *Kelly-Frye* standards." It also claimed that any relevance was "far outweighed by the prejudice" from its "misapplication," jury confusion, and undue consumption of time. Further, the defense asserted that such evidence would be appropriate only "by way of rebuttal." The defense requested an Evidence Code section 402 hearing to determine relevance and scope. The prosecution asserted that the CSAAS testimony would be admissible to "dispel the misconceptions regarding accommodation, secrecy, helplessness, and delayed disclosure."

The court overruled the defense objections to Lewis's testimony.[6] It found that "CSAAS is not subject to the Kelly-Frye standard," and the CSAAS testimony would be relevant to dispel any misconceptions. The court limited the CSAAS testimony to "its purpose" "of educating the jury about a child's reaction to molestation so that the jury may evaluate the evidence free of constraints of popular myth, and in particular to dispel the misconception regarding accommodation, secrecy, helplessness and delayed disclosure." The court precluded the CSAAS evidence from being used "to prove that a sexual molestation . . . had occurred." The parties agreed that Lewis could testify before Michael finished his direct testimony and before cross-examination. They also agreed that the defense CSAAS expert could testify before Michael was cross-examined.

---

[6]     The court specified that its in limine rulings would be effective through trial.

Lewis testified that he had investigated hundreds of child sexual abuse cases, and he had been teaching police officers and other professionals about child sexual abuse investigation since 1995. He was familiar with CSAAS and had qualified as an expert on CSAAS about 300 times.[7] Lewis knew nothing about this case. He testified that CSAAS was "very distinct from a diagnosis." "No person can be diagnosed or can be said to suffer from [CSAAS]." He emphasized that CSAAS "is not an indicator or predictor of sexual abuse;" it is intended to explain what "might be counter-intuitive." Lewis stated categorically that CSAAS "cannot be used" to determine whether someone has been molested.

Lewis described how CSAAS had first been recognized by Dr. Roland Summit. Summit had observed that clinicians were rejecting allegations of sexual abuse by children because the children "didn't look or act like what the therapist thought an abused child should look like." Studies of both victims and offenders where most of the offenders eventually admitted the allegations demonstrated that the therapists' assumptions were not accurate. Summit wanted professionals to realize that, despite the "outward appearance" of and "seemingly conflicting behavior" of child sexual abuse victims, "their allegations might be true." Defendant's trial counsel objected to Lewis's testimony that, despite counterintuitive conduct by the child, "their allegations might be true," but his objection was overruled.

Lewis explained that Summit's work showed that there are five "myths" or "categories" concerning how a child sexual abuse victim would act that are "not true." The first category is secrecy. Usually, the molestation will take place in secret, and the molester will try to isolate the victim from friends. The molester may threaten the victim that disclosure will get the victim in trouble or cause bad things to happen. The second category is helplessness, such as where the child is dependent on the molester. The third

---

[7] Defendant's trial counsel did not challenge Lewis's expertise on CSAAS.

category is entrapment and accommodation. The child will often act as if nothing is wrong and will continue to associate with the abuser. The fourth category is delayed, conflicted, unconvincing disclosure. The child will often delay disclosing the abuse for a substantial period of time and provide inconsistent or incomplete accounts of the abuse. The fifth category is retraction. The child may disclose and then retract the allegations due to the disruption caused by the disclosure.

On cross-examination, defendant's trial counsel elicited Lewis's testimony that CSAAS "works on the assumption that molest occurred." Lewis repeatedly stated that CSAAS was simply intended to explain "unexpected conditions." He confirmed that CSAAS "cannot be used to discern between true or false allegations." Lewis reiterated this on redirect. He testified that CSAAS cannot tell the jury whether somebody has been molested. Its purpose is solely to provide an explanation for "unexpected" conditions "that many people may not have the background to understand." CSAAS helps to dispel "preconceptions about how people are expected to act, how someone might react to the stimuli of being sexually abused."

Annette Ermshar, a clinical psychologist, testified as a defense expert on CSAAS. She characterized Summit's work as nothing more than clinical observations intended to inform clinicians working with children. Summit was not trying "to find truth" because the children he was working with were known to have been sexually abused. Ermshar asserted that Summit's work necessarily involved "confirmation bias" since the children exhibiting the behaviors all had been abused. She testified that there were no clinical methods that could distinguish false sexual abuse claims from true ones. On cross-examination, Ermshar confirmed that she had seen instances of molest victims exhibiting all of the behaviors described by Lewis and that a child should not be disbelieved simply because the child exhibits such behaviors.

13

Defendant's trial counsel elicited testimony that Michael's initial statement to the police had been less complete than his subsequent testimony, and he pointed out various inconsistencies between Michael's statements to the police and his testimony.

The prosecution and the defense agreed that the trial court should instruct the jury with CALCRIM No. 1193. The jury was instructed: "During the trial certain evidence was admitted for a limited purpose. You may consider that evidence only for that limited purpose and for no other." "You have heard testimony from Carl Lewis and Annette Ermshar regarding Child Sexual Abuse Accommodation Syndrome. Their testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not Michael's conduct was not inconsistent with the conduct of someone who has been molested in evaluating the believability of his testimony."

Defendant's trial counsel argued to the jury: "We have a biased adult accuser, not a child, with a motive. There's a four year supposed delay of disclosure and numerous, multiple, inconsistent, unreliable, contradicted statements." He detailed inconsistencies between Michael's testimony and his prior statements. And he argued to the jury: "So he's lied to you, contradicted himself from large details to small ones. He can't keep it straight." Defendant's trial counsel also spent considerable time arguing to the jury regarding the CSAAS evidence. "What is it? Why do we need it? What does it do? We know what it cannot be used for. It cannot prove the presence of any sexual abuse." Defendant's trial counsel argued that the prosecutor was using the CSAAS testimony "to excuse the contradictions, inconsistencies of Michael's testimony." "What do we know about the syndrome? It assumes abuse occurred. We know that." He claimed that the CSAAS evidence was intended to create "a wall of immunity to Michael's testimony."

## 2. *Kelly*

Defendant claims that the trial court prejudicially erred in overruling his objection under *Kelly* to the CSAAS testimony.

14

"In *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*), [the California Supreme Court] held that evidence obtained through a new scientific technique may be admitted only after its reliability has been established under a three-pronged test." (*People v. Bolden* (2002) 29 Cal.4th 515, 544.) "*Kelly/Frye* only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156.) *Kelly* applies only where "the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury. The most obvious examples are machines or procedures which analyze physical data. Lay minds might easily, but erroneously, assume that such procedures are objective and infallible." (*Ibid.*) "[A]bsent some special feature which effectively blindsides the jury, expert opinion testimony is not subject to *Kelly/Frye*." (*Stoll*, at p. 1157.)

CSAAS testimony is not *new* to science or the law. California courts have long held that *Kelly* does not apply to the admission of CSAAS testimony. (*People v. Harlan* (1990) 222 Cal.App.3d 439, 448 (*Harlan*).) CSAAS testimony does not purport to provide any "definitive truth" but merely attempts to allay misconceptions that lay persons may harbor about the conduct of molestation victims. This type of expert testimony lacks any "special feature" that might "blindside[]" the jury, and therefore is not subject to *Kelly*. The trial court did not err in overruling defendant's *Kelly* objection to the admission of the CSAAS evidence.

### 3. Relevance

Defendant claims that the trial court erroneously overruled his relevance objection to Lewis's CSAAS testimony because there was not substantial evidence that any of the "myths" described by Lewis were relevant in this case.

The prosecution asserted that the CSAAS evidence would be relevant to dispel myths concerning "accommodation, secrecy, helplessness, and delayed disclosure."

15

Michael's testimony revealed that he had kept the abuse secret for four years and continued to comply with defendant's demands because he feared defendant would follow through on his threats. Even after he reported the abuse, he attempted to retract his allegations due to defendant's multiple threats. Michael's testimony demonstrated that defendant's position of trust contributed to Michael's feeling of helplessness. The defense explicitly challenged Michael's account of defendant's abuse by pointing to Michael's delayed disclosure and to inconsistencies in his statements. In this context, Lewis's testimony about the five "myths" had considerable relevance, and the court did not err in overruling defendant's relevance objection.

### 4. Evidence Code Section 352

Defendant claims that the CSAAS testimony should have been excluded under Evidence Code section 352. He asserts that "no legitimate inference" could be drawn from the CSAAS testimony, and it was prejudicial because it had "the potential to evoke sympathy" for Michael.

Trial courts have the discretion to exclude evidence pursuant to Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

The CSAAS evidence was neither irrelevant nor unduly prejudicial. The CSAAS evidence had considerable relevance to dispel common misconceptions about molestation victims that were material here in light of Michael's delayed disclosure, inconsistencies, and continued association with defendant for four years. The jury was precluded from using this evidence in any unduly prejudicial fashion because it was explicitly instructed that it could use this evidence "only in deciding whether or not Michael's conduct was not inconsistent with the conduct of someone who has been molested in evaluating the

16

believability of his testimony." The trial court did not abuse its discretion in overruling defendant's Evidence Code section 352 objection.

## 5. Scope of CSAAS Testimony

Defendant contends that the trial court prejudicially erred in permitting Lewis to provide testimony that exceeded the proper scope of CSAAS evidence.

Defendant first challenges a small part of a lengthy answer that Lewis gave in response to the prosecutor's question about Summit's observations. At the end of his response, Lewis explained that Summit "felt it was important" to make people aware "that despite a child's outward appearance or seemingly conflicting behavior that their allegations might be true." Defendant's trial counsel objected, and the objection was heard at sidebar off the record. The court later made a record of the sidebar proceedings. The defense objection to this testimony was that it exceeded "the limitations of the syndrome being testified to" because "it's not a diagnostic tool." The court found that "in context" the testimony properly explained the basis for Summit's observations.

The trial court did not err in overruling this objection. The proper purpose of CSAAS testimony is to dispel common misconceptions about the behavior of child molestation victims so that the jury will not rely on those misconceptions to discount allegations that "might be true." Lewis's testimony was entirely consistent with the limited purpose for which CSAAS testimony is properly admitted, and it did not suggest that CSAAS evidence is "a diagnostic tool." This portion of his testimony merely relayed Summit's observation that certain behaviors by alleged molest victims did not mean that their allegations were not true.

Defendant's in limine objection to Lewis's testimony sought to limit its scope "to a general description of CSAAS and may not be applied to the facts of the current case." On appeal, he challenges several small bits of Lewis's testimony on the ground that they applied to facts of the case.

17

First, at trial, defendant's trial counsel objected when the prosecutor asked Lewis if "secrecy" might apply to "[t]urning up a TV?" Before Lewis could answer the question, defendant's trial counsel said: "Your Honor, I'm going to object. I'm going to ask that the witness answer the question not the attorney." After a sidebar discussion, the prosecutor did not reask the question, and Lewis did not answer it. Defendant now contends that this question exceeded the proper scope of CSAAS evidence because it diverged from a general description of CSAAS and instead tried to relate CSAAS to specific facts involved in this case. Since Lewis did not respond to this question, this *question* could not have resulted in the admission of improper evidence.

The prosecutor subsequently elicited without objection Lewis's testimony that isolating the child, limiting the child's friends, and threatening the child might contribute to secrecy, that the child's dependency on the abuser could contribute to helplessness, and that the child's hesitancy to disclose could contribute to delayed disclosure. The prosecutor's detailed hypothetical questions were clearly based on specific facts in this case, but the questions never suggested that these facts showed that the hypothetical child had been molested. All of the questions were aimed at explaining the reasons why a child's behavior might appear inconsistent with abuse even if the child had been abused.

Defendant relies on *People v. Bowker* (1988) 203 Cal.App.3d 385 (*Bowker*). In *Bowker*, the expert testified that CSAAS could be used to determine whether a child's behavior was "consistent with molest" and provided testimony based on the facts of the case that "constructed a 'scientific' framework into which the jury could pigeonhole[] the facts of the case." (*Bowker*, at p. 395.) The *Bowker* court found that testimony exceeded the proper scope of CSAAS testimony.

Defendant's reliance on *Bowker* is misplaced. Here, Lewis not only never suggested that CSAAS could be used to determine whether a child's behavior was "consistent with molest," he explicitly and repeatedly testified that CSAAS could *not* be used in such a fashion. Nor is there any validity to defendant's assertion that *Bowker*

18

bars CSAAS testimony in response to hypotheticals based on the facts of a particular case. In *Harlan*, *supra*, 222 Cal.App.3d 439, the defendant contended that "the expert testimony was tied too closely to the facts of the case and led to the impression that the victim must have been molested . . . ." However, the Court of Appeal found that the testimony was not improper because it "related directly" to one of the misconceptions described by CSAAS. (*Harlan*, at p. 450.) The same is true here. The testimony of Lewis that defendant challenges "related directly" to the specific misconceptions described by CSAAS. The trial court did not err in permitting Lewis to give this testimony.

### 6. CALCRIM No. 1193

Defendant claims that CALCRIM No. 1193 does not properly instruct the jury on the limited purpose of CSAAS testimony. He claims that CALCRIM No. 1193 permits the jury "to use CSAAS testimony to conclude the victim's claim the defendant sexually abused him is true" and "does not inform the jurors that CSAAS assumes the truth of Michael's claim."

Defendant's claims lack merit. It was not necessary for the CSAAS limiting instruction to tell the jury that "CSAAS assumes the truth" of the molest because Lewis explicitly told the jury that CSAAS "works on the assumption that molest occurred." The jury could not have accepted Lewis's CSAAS testimony without also accepting this testimony. Defendant's claim that CALCRIM No. 1193 permitted the jury to use the CSAAS testimony "to conclude the victim's claim . . . is true" is belied by the language of the instruction. CALCRIM No. 1193 told the jury that the CSAAS evidence "is not evidence that the defendant committed any of the crimes charged against him." It also told the jury that the "only" "limited purpose" for which it could use the CSAAS evidence was "in deciding whether or not Michael's conduct was not inconsistent with the conduct of someone who has been molested in evaluating the believability of his testimony." No reasonable juror could have concluded from this language that he or she

could properly use the CSAAS evidence as a template for determining whether the molestations occurred. While it is true that evaluating an alleged molestation victim's "believability" may ultimately assist the jury in determining whether the molestations occurred, the same may be said of any evidence relevant to a witness's credibility. CALCRIM No. 1193 properly instructed the jury on the limited purpose to which it could put CSAAS evidence.

## B. CALCRIM No. 3501

### 1. Background

The prosecution requested CALCRIM No. 3501.[8] At the instruction conference, the following colloquy occurred: "[THE COURT:] 3501. 'The defendant is charged with forced sodomy and forced oral copulation in Counts 1 through 10 sometime during the period of,' and the Court will insert in there the dates from the charging document from the beginning, the first day, to the last day of the charging period included in all 10 counts. [¶] Is that correct? [¶] MS. WEST [the prosecutor]: That's correct. [¶] THE COURT: Mr. Luu? [¶] MR. LUU [defendant's trial counsel]: Yes."

The jury was instructed on each of the charged sodomy and oral copulation counts as they were alleged in the information. It was told that counts 1 and 2 were alleged to have occurred "[o]n or about and between February 11, 2007, and February 10, 2008," and counts 3 and 4 were alleged to have occurred "[o]n or about and between February 11, 2008, and February 10, 2009." Similarly, the jury was instructed that counts 5 and 6 were alleged to have occurred "[o]n or about and between February 11, 2009, and February 10, 2010," and counts 7 and 8 were alleged to have occurred "[o]n or about and between September 9, 2010, and April 20, 2011." Counts 9 and 10 (the oral copulation

---

[8] Opening statements were not transcribed, so the record does not reveal whether the prosecutor elected to rely on specific acts to support specific counts.

counts) were alleged to have occurred "[o]n or about and between February 11, 2010, and September 8, 2010." Hence, each of the five pairs of counts alleged a different time period.

The version of CALCRIM No. 3501 given to the jury provided: "The defendant is charged with forced sodomy and forced oral copulation in Counts 1 through 10 sometime during the period of February 11, 2007 to September 8, 2010. The People have presented evidence of more than one act to prove that the defendant committed these offenses. [¶] You must not find the defendant guilty unless: [¶] One. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed for each offense. [¶] Or, two. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged."

The prosecutor argued to the jury: "This case comes down to the words of two people. Either you believe Michael or you believe the defendant. This isn't a case where you need to really look carefully at each detail and see who said what at what time. Someone's telling the truth and someone isn't. The stories are that far apart." "And if you believe what Michael says, you're gonna find defendant guilty of everything. And if you believe what defendant says, then he's not guilty of any of this, because this isn't an age thing. This is a forcible sodomy, oral copulation, dissuading a witness case." "Either he mind-controlled Michael and raped him for four years or they're lovers and Michael set him up. It's one or the other. It's not half and half." "One person is lying and one person [is] telling the truth."

"Now the jury instructions will tell you about the dates for Count 1 through 8." "So 1 and 2 are for age 15. 3 and 4 are for age 16. 5 and 6 are for age 17. [¶] Then we're going to jump over to forced oral cop . . . . So time wise we're going to jump to Counts 9 and 10, and that is for 18 to 18 and a half, and then counts back up here, 7 and

21

8, are for sodomy between 18 and a half to the day he reported. [¶] So what he's telling you is this happened more than 100 times during that time period, at least two for each of those time periods that I gave you. So as long as you all agree it happened at least twice when he was 15, twice when he was 16, twice when he was 17, twice during the time period he was forced to orally copulate defendant, twice during that time period, then you find him guilty." "You've heard from Michael. You know he's telling the truth. You've heard from defendant. You know that he has lied to you."

Defendant's trial counsel argued to the jury that "[defendant's] and Michael's relationship . . . was consensual sex."

## 2. Analysis

Defendant claims that the version of CALCRIM No. 3501 given to the jury by the trial court was flawed in several respects.

"It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538, disapproved on a different point in *People v. Reyes* (1998) 19 Cal.4th 743, 756.) We evaluate the challenged instruction in the context of all the instructions given by the trial court. (*Boyde v. California* (1990) 494 U.S. 370, 378.) "[I]nstructions that might be ambiguous in the abstract can be cured when read in conjunction with other instructions." (*Jones v. United States* (1999) 527 U.S. 373, 391 (*Jones*).) "[An] instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record. [Citation.] In addition, in reviewing [a potentially] ambiguous instruction such as the one at issue here, we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 (*Estelle*).)

Defendant argues that *Estelle*'s "reasonable likelihood" standard does not apply here because that standard applies only to ambiguous, confusing, or misleading

22

instructions. (See *People v. Ngo* (2014) 225 Cal.App.4th 126, 165.) The defect in his argument is that his challenges to the version of CALCRIM No. 3501 given by the trial court are all premised on claims that the instruction misled the jury about the distinct time periods applicable to each pair of counts. Such challenges necessarily depend on a claim that the jury would have been misled or confused by the conflict between the instructions as to the appropriate time period to apply to each count. Under these circumstances, the "reasonable likelihood" standard does apply.

Defendant claims that the first sentence of the instruction erroneously told the jury that it need only find that defendant had committed 10 acts *during the entire period* in order to find all of the counts true. The first sentence of the instruction read: "The defendant is charged with forced sodomy and forced oral copulation in Counts 1 through 10 sometime during the period of February 11, 2007 to September 8, 2010." This sentence by itself was inaccurate because it failed to include the distinct time period that was charged as to counts 7 and 8, September 9, 2010 through April 20, 2011. However, our evaluation of a jury instruction necessarily requires us to consider all of the instructions given to the jury. While this sentence failed to include the time period applicable to counts 7 and 8 and did not mention that each of the other pairs of charges alleged a distinct time period within that larger time period, the instructions on the individual counts clearly informed the jury of the distinct time periods that applied to each pair of counts. We reject defendant's invitation to assume that the jury would have understood this one-sentence introductory sentence to the unanimity instruction to countermand the detailed and complete instructions given as to each count. When we consider the instructions as a whole, we can find no reasonable likelihood that the jury would have been misled by this sentence to disregard the distinct time periods charged as to each pair of counts.

Defendant's second challenge to this instruction concerns the instruction's use of the words "act" and "offenses" in the second sentence and the "one" alternative in the

23

instruction. He claims that the jury would have understood "act" to refer to a single act of sodomy or oral copulation, but it would have understood "offenses" to refer to just two "offenses," sodomy and oral copulation, rather than to the 10 counts of sodomy and oral copulation with which defendant was charged. Defendant reasons that the jury would have parsed this language to mean that it need only unanimously agree on one act of sodomy and one act of oral copulation in order to convict defendant on eight counts of sodomy and two counts of oral copulation.

Defendant's reasoning is illogical. No reasonable juror would have ascribed this meaning to this language. The second sentence of the instruction plainly used "these offenses" to refer back to the first sentence's reference to "Counts 1 through 10." Since "these offenses" were 10 counts, and the instruction clearly told the jury that "you all [must] agree on which act he committed for each offense," no reasonable juror could have understood that "each offense" meant anything other than the 10 counts referenced in the first sentence of the instruction.

Defendant's third challenge to the instruction is that the second alternative in the instruction was erroneously described. He claims that the instruction erroneously told the jury that "if they agree the defendant committed the number of offenses charged, they can convict him on all of them" rather than telling the jury that this alternative depends on unanimous agreement that defendant committed all of the acts "described by the victim." The challenged language said: "You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged." Again, defendant's argument depends on his hypertechnical construction of the language in this sentence. We see no reasonable likelihood that reasonable jurors would have understood "all the acts alleged to have occurred" to mean anything other than all of the acts that Michael alleged. Defendant's argument depends on the jurors reading this sentence to say that they had to agree that defendant committed all 10 of the charged acts

24

and that defendant committed at least the 10 charged acts. Such a construction of this language would render it meaningless.

Since there is no reasonable likelihood that the jury construed the unanimity instruction in any of the ways that defendant imagines and the other instructions plainly cured the unanimity instruction's time-period flaw (*Jones*, *supra*, 527 U.S. at p. 391), we reject defendant's challenges to the unanimity instruction.

### C. Cruel and Unusual Punishment

Defendant contends that his 84-year prison term is cruel and unusual because it "serves no legitimate penal purpose."

He bases his argument on the United States Supreme Court's decision in *Coker v. Georgia* (1977) 433 U.S. 584 (*Coker*) and a concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585 (*Deloza*).

*Coker* was a death penalty case in which the court held that it categorically violates the Eighth Amendment to impose the death penalty for the crime of rape because such a punishment is excessive and disproportionate. (*Coker*, *supra*, 433 U.S. at p. 592.) The *Coker* court stated: "[T]he Eighth Amendment bars not only those punishments that are 'barbaric' but also those that are 'excessive' in relation to the crime committed. . . . [A] punishment is 'excessive' and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. A punishment might fail the test on either ground." (*Coker*, at p. 592.)

*Deloza* was a case in which the defendant received a prison sentence of more than 100 years to life. The majority opinion had nothing to do with cruel and unusual punishment. The issue was whether the court had discretion to impose concurrent rather than consecutive terms. The case was remanded for resentencing because the trial court

had misunderstood the scope of its discretion to impose concurrent terms. (*Deloza*, *supra*, 18 Cal.4th at p. 599.) Justice Mosk concurred separately and opined that a sentence "impossible for a human being to serve" was cruel and unusual. (*Deloza*, at p. 600.) Defendant cites no case in which a sentence was found to be cruel and unusual because it was "impossible for a human being to serve," and several published cases have rejected the contention. (*People v. Haller* (2009) 174 Cal.App.4th 1080, 1089; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231; *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1382-1383.)

Defendant asserts that his sentence is cruel and unusual because "a sentence that no human being could conceivably complete serves no rational legislative purpose, under either a retributive or a utilitarian theory of punishment." *Coker* provides no support for this premise because its holding was that *death* was an excessive punishment for rape. Defendant was not sentenced to death. He was sentenced to 84 years in prison. While we accept defendant claim that his sentence is essentially a life sentence, we reject his claim that his life sentence serves no rational legislative purpose.[9]

Defendant fails to cite any authority for the proposition that a life sentence for his offenses would serve no rational punitive purpose. The "classic concerns of sentencing" are "retribution, deterrence, and incapacitation." (*People v. Mesce* (1997) 52 Cal.App.4th 618, 632; see also *In re Nunez* (2009) 173 Cal.App.4th 709, 730 ["Valid penological goals include retribution, incapacitation, rehabilitation, and deterrence."].) Defendant's life sentence serves all three of these goals of punishment.

Defendant's 84-year sentence is the product of the mandatory application of section 667.6 combined with the trial court's decision to impose upper terms. "By

---

[9]   Defendant was 26 years old when he was arrested. Since his worktime credit will be limited to 15 percent (§ 2933.1), he must serve just over 71 years in prison. We agree with defendant that the likelihood that he will survive until he reaches the age of 97 in prison are minimal.

requiring a full, separate, and consecutive term for each rape, Penal Code section 667.6, subdivision (d) attempts to 'provide increased punishment in cases of greater culpability based upon injury to the victims and society.' [Citation.] The severity of [the defendant's] sentence is directly proportionate to the number and violence of his crimes. Mandatory imposition of consecutive sentences for multiple violent rapes does not constitute cruel and unusual punishment." (*People v. Preciado* (1981) 116 Cal.App.3d 409, 412.) "The statute is directed at multiplicity of offenses by providing for full, separate, consecutive sentencing. In view of the outrageous nature of violent sexual offenses and the manifest danger to society from recidivism and multiplicity of offenses, we cannot say that the severity of the punishment is so disproportionate to the crimes so as to shock the conscience and offend fundamental notions of human dignity." (*People v. Karsai* (1982) 131 Cal.App.3d 224, 242, disapproved on a different point in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn.8.) The Legislature's decision to mandate full, separate, and consecutive terms for multiple violent sexual offenses clearly serves the goals of incapacitation, deterrence, and retribution. The offender is incapacitated by a longer prison term, and greater retribution is merited due to the offender's greater culpability. The offender and other potential offenders may be deterred by the lengthy prison term.

The trial court's decision to impose upper terms for each count was also supported by the goals of retribution, incapacitation, and deterrence. Defendant makes no attempt to challenge the validity of the numerous aggravating circumstances relied on by the trial court. Defendant's offenses were beyond cruel. He spent years grooming Michael and establishing himself in a position of trust that would facilitate his sexual abuse. He then manipulated Michael into submitting to his threats and repeatedly forcibly sodomized this vulnerable boy throughout most of Michael's adolescence. Not only did defendant perpetrate four years of unrelenting forcible sexual abuse on Michael, but the abuse escalated as the years went by. Michael lost a large portion of his formative years to

27

defendant's sexual abuse. The trial court's decision to impose upper terms, like the Legislature's decision to mandate full, separate, and consecutive terms, ensures that defendant will remain in prison for the rest of his life thereby incapacitating him from perpetrating any further sexual abuse in the community. It also serves the goals of retribution for defendant's extremely culpable conduct and deterrence of anyone who might consider such conduct.

The imposition of a life sentence on defendant will free the community of his corrupting influence and deprive him of the freedom that he so abused. His conduct caused great damage to Michael, who continues to suffer from nightmares about defendant's abuse of him and has difficulty trusting people. Although the Static-99R scored defendant at low risk of reoffending, this was largely because his lengthy prison term was expected to incapacitate him. The fact that defendant has continued to insist that he "did not do anything wrong" and that his relationship with Michael was "a consensual relationship" heightens the risk that defendant would continue to pose a danger to the community if he were not incarcerated. He accepts no responsibility for his actions and blames Michael for lying and betraying him. Defendant's sentence of 84 years in prison is not cruel and unusual punishment.

### D. Ineffective Assistance of Counsel

Defendant claims that his trial counsel was prejudicially deficient in failing to (1) object to Lewis's testimony as inadmissible hearsay, (2) object to CALCRIM No. 1193, (3) object to CALCRIM No. 3501, and (4) object to the court's decision to impose upper terms.[10]

---

[10] Defendant initially claimed that his trial counsel was prejudicially deficient in failing to renew his relevance objection to the CSAAS evidence, but he withdrew this contention in his reply brief.

28

When a defendant challenges his conviction based on a claim of ineffective assistance of counsel, he must prove that counsel's performance was deficient and that his defense was prejudiced by those deficiencies. (*People v. Ledesma* (1987) 43 Cal.3d 171, 218; *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, at p. 694.)

Defendant's trial counsel's failure to object to the two instructions was not prejudicial because CALCRIM No. 1193 was not defective and there was no reasonable likelihood that the jury would be misled by CALCRIM No. 3501.

His trial counsel's failure to interpose a hearsay objection to Lewis's testimony was not prejudicial as such an objection would not have been successful. An expert may properly "base an opinion on reliable hearsay, including out-of-court declarations of other persons" (*In re Fields* (1990) 51 Cal.3d 1063, 1070) "so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions" (*People v. Gardeley* (1996) 14 Cal.4th 605, 618 (*Gardeley*)). "And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion." (*Gardeley*, at p. 618.)

Defendant claims that Lewis could not properly describe Summit's observations as the basis for Lewis's opinion testimony because Lewis did not testify about *any opinions of his own* but merely reported Summit's observations. Defendant mischaracterizes Lewis's testimony. Lewis testified as an expert because he had personally investigated hundreds of child sexual abuse cases and had been teaching other professionals about child sexual abuse for more than 15 years. Lewis's description of Summit's groundbreaking work was a necessary part of his description of the longstanding

29

recognition of CSAAS by other experts. He did not rely solely on Summit's observations. His testimony was informed by his own many years of experience. Lewis repeatedly expressed his own expert opinion in response to questions. Under these circumstances, Lewis could properly describe Summit's observations as part of the basis for Lewis's expert testimony since Summit's observations were the type of material that is reasonably relied upon by experts in this field.

There is no merit to defendant's claim that he was prejudiced by his trial counsel's failure to object to the trial court's imposition of upper terms. The probation officer recommended a term of 84 years in prison, and the prosecutor agreed. The prosecutor, defendant's trial counsel, and the court all agreed that "full term consecutive" sentences were required by "the law." Defendant's trial counsel asked the court to impose mitigated terms for a total term of 31 years because defendant had no prior criminal history. The court rejected this request and found that upper terms were merited because there were multiple aggravating circumstances that outweighed the sole mitigating circumstance of no prior criminal record. The court identified four aggravating circumstances. The planning and sophistication of the offenses was demonstrated by defendant's coercion, threats, and intimidation, and the lengthy period over which the offenses took place. The offenses involved great violence, including defendant hitting Michael with a stick and branding him with a piece of jade. Defendant took advantage of a position of trust and confidence that he had attained as Michael's tutor and solidified through taking Michael on outings and taking responsibility for transporting Michael to and from school. This position allowed defendant to control and manipulate Michael by threats and violence. Finally, the length of the period of time over which the crimes occurred "basically robbed the victim of his childhood."

Defendant does not challenge the sufficiency of the evidence to support the trial court's findings regarding the aggravating circumstances. His sole contention is that his trial counsel should have raised the unsuccessful cruel and unusual punishment argument

30

that he makes on appeal.  Since that argument lacks merit, his trial counsel's failure to raise it below could not have prejudiced defendant.

## E.  Cumulative Prejudice

As we have not found multiple errors, there is no prejudice to cumulate.

## IV.  Disposition

The judgment is affirmed.

_____

Mihara, J.

WE CONCUR:



_____

Bamattre-Manoukian, Acting P. J.



_____

Márquez, J.

32